Filed 1/30/26  In re E.P. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re E.P., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | |
| Plaintiff and Respondent, | G065726 |
| v. | (Super. Ct. No. DP026891-002) |
| M.M., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Adrianne E. Marshack, Judge. Affirmed in part, reversed in part, and remanded with directions.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torrez and Aurelio Torre, Deputies County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*　　　\*　　　\*

Mother appeals after the juvenile court made jurisdictional findings declaring her 13-year-old son (the minor) a dependent of the court pursuant to Welfare and Institutions Code section 300, subdivisions (a), (b)(1), (g) and (j), and ordered him removed from her and the minor's father's custody with the provision of reunification services to her.[1] She challenges the sufficiency of the evidence to support the court's jurisdictional findings. We find insufficient evidence to support the findings made under subdivisions (a), (g), and (j), as well as (b)(1) to the extent based on certain of the sustained factual allegations. However, because we find substantial evidence supports the finding of jurisdiction under subdivision (b)(1) based on other sustained factual allegations, we conclude there was a valid ground for the court to exercise jurisdiction over the minor. Accordingly, we affirm the order in part, reverse the order in part, and remand the matter with directions to enter an order striking an unsubstantiated factual allegation and vacating specified erroneous jurisdictional findings.

## FACTS

In early May 2025, the minor was taken into protective custody by the Anaheim Police Department after a neighbor found him hiding under stairs with observable bruises on his face and arms, as well as some cuts on his legs. The neighbor conveyed the then 13-year-old said his aunt and uncle, with whom he was living, had been physically abusing him, withholding food,

---

[1] All further statutory references are to the Welfare and Institutions Code.

2

and tying him to a bed so he could not leave. It was determined the minor needed to be medically cleared, so officers transported him to a hospital where the Orange County Social Services Agency (SSA) later made contact with him. Although SSA initially thought the aunt and uncle were the minor's legal guardians, it determined within the next couple of days that mother had only given the aunt a limited power of attorney regarding the minor.

I.

DETENTION REPORT

Among other matters, SSA's detention report detailed interviews it conducted on the day the minor was taken into protective custody and the two days thereafter, information about a 2015 juvenile dependency proceeding involving the minor and his sister, and details of prior inquiries by SSA into allegations of abuse against the minor by the aunt and uncle.

*A. Interviews*

SSA interviewed the minor at the hospital where he was being evaluated. He appeared "bubbly, social, and friendly" with SSA, police officers, and all medical staff. The minor explained he lived with the aunt and uncle, their then four-year-old son (the cousin), and two of the uncle's brothers. He said he had frequent telephone contact with mother but had not seen her in-person for two to three years. Regarding his father, the minor said he "lives 'on the streets' and he last saw him when he was 3 years old."

As for the situation at the aunt and uncle's house, the minor said they had been abusing him "for about 2.5 years and social workers have not believed him in the past." He relayed they hit him whenever they want and do not care if he cries or bleeds. SSA observed bruises and marks on the minor's body, and he said they were caused by the aunt and uncle. He

3

explained they hit him using the metal part of a belt, a metal pole, or their hands, and the aunt has hit him on the head with her phone. The minor also reported the aunt and uncle "tie him up by the arms and neck every night on the side of the bunk bed while he is standing," making him sleep standing up or on the floor. He related that the night before officers took him into protective custody, the uncle "'choked [him] with both his hands, . . . [the minor] passed out[,] and when [he] woke up [his] nose and mouth [were] bleeding.'"

Aside from the physical acts, the minor said the aunt and uncle do not let him eat for a month if he does his chores incorrectly or too slowly. The last such incident occurred a week prior, and he stated he had not been allowed to eat since then. When the aunt and uncle found out he was eating at school, they took him out of school for the remainder of the week.

When asked whether and to what extent he felt safe with his aunt and uncle, he said he did not feel safe because they hurt him and his uncle "'hurts [him] with the metal part of the belt and leaves bruises.'" He did not want to share any details about specific incidents.

SSA learned from the treating nurse that all the minor's tests "came back clear" so SSA took him to Orangewood Children and Family Center (Orangewood). During the drive, the minor got tears in his eyes and expressed happiness that he was "going to somewhere that he would be safe." He explained that while living with the aunt and uncle, "he would listen to calming music as a coping mechanism and to stop him from feeling angry and sad about his living situation and the abuse he endured." The minor also reiterated that the aunt and uncle withheld food from him as punishment; he ate two sandwiches, three packs of goldfish crackers, and multiple juices while at the hospital.

4

During mother's initial interview, she told SSA she has full legal and physical custody of the minor, and denied father having any contact or visitation with him. She explained that she placed the minor in the aunt's care about two and a half to three years earlier "because there was a case in San Bernardino County where the [minor] was claiming the mother 'beat him up'" and a different maternal aunt alleged she saw the minor "on top of his sister . . . inappropriately." Mother said she last saw the minor in person about two weeks before, and she visits the minor at least three to four times a month.

Regarding the circumstances at the aunt and uncle's house, mother stated she learned from the aunt that police reported the minor was being tied to the bed and physically abused. Mother said the former was a "'lie,'" explaining she believed the minor "is manipulative and has a history of being aggressive toward school staff and students." Regarding physical abuse, mother denied the minor ever telling her he was being abused. Although she saw marks or bruises on him in the past, she conveyed he harms himself by "'hit[ting] himself with things like a table or scooter'" and he "bruises easily." However, when separately questioned about the aunt and uncle's method of discipline, mother said she believed the uncle disciplines the minor "by hitting him on the buttocks with a "*chancla*" (sandal) or his hand," and the aunt "yell[s] or spank[s] him on the buttocks with an open hand."

Overall, mother expressed doubts about the allegations, saying the aunt and uncle "would never do that." Specifically regarding the aunt, she stated she "kn[e]w [the aunt] wouldn't do [those things] because she [was mother's] main support system." Instead, mother "believe[d] the [minor was]

5

making false allegations because he does not get what he wants and because he does not like rules."

Separate from her comments about the allegations, mother expressed concern about other behavior in which the minor was known to engage. She said "he has a history of inserting objects into his anus" and, in the past, took videos of himself doing so. Mother had him evaluated in the past, but "he came[] back normal." Because she does not know why he does it and is concerned it might be because of some unknown past sexual abuse, she wanted him to be evaluated.

As far as reunification, "mother stated she want[ed] the [minor] back in her care, 'but not until he gets better.'" She explained that past efforts to get him services were unsuccessful because he was not cooperative. She expressed interest in reunification services and felt the minor would be "better off at Orangewood in the meantime." With support and services in place, she would be willing to have him back in her care.

SSA also spoke to the aunt and uncle on the day the minor was taken into protective custody. They denied all the allegations, confirming the minor and the cousin have enough food to eat and stating they do not use physical discipline. Regarding the latter, they said they discipline by taking away phones and screen time. However, when separately interviewed, each admitted to hitting the minor one time, "over his clothing, on the buttocks." Specifically, when the aunt and uncle found out the minor stole approximately $600 in cash from them the week prior, the aunt hit him with her shoe and the uncle hit him with a belt. Neither knew if the minor sustained any bruises or marks as a result.

When asked about the minor's bruises, the aunt said the minor refused to respond when she asked him about them. She shared he "ha[s] a

history of hitting himself and that he bangs his head when he is upset." She thought the behavior was "'odd,'" so she previously tried to get him evaluated. Regarding cause, the aunt expressed her belief that the bruises were sustained at school because the minor "has a history of being bullied at his school," of which the school was aware, and he "is known to constantly engage in fights." When asked if she reported the bruises to the minor's doctor or school staff, she said she did not because "she did not know she was expected to report [it]." Separately, the uncle said the minor was "always observed arriving from school with marks and bruises."

As for the allegations of tying the minor to a bed, the aunt and uncle denied ever doing so. The uncle confirmed a scarf, which law enforcement took as part of its investigation, was previously tied to a bed. However, he explained it was tied there because the cousin liked to play with it; he swung his toys on it.

Aside from addressing the allegations, the aunt and uncle expressed concern about the minor possibly having been subjected in the past to sexual abuse. The aunt was aware of the past instances described by mom involving the minor inserting objects into his anus. She did not know it had occurred since living at the aunt and uncle's house until she found evidence the night before of him doing so. After discussing what she found with mother, they agreed the aunt would take the minor to Orangewood so he could be enrolled in a program to address the behavior. The aunt intended to do so on the morning of the day police ended up taking the minor into protective custody.

When SSA spoke with the doctor who evaluated the minor, the doctor explained that although the test results were all normal, "the [minor] ha[d] a lot of injuries [(i.e. bruises and marks)] in a lot of protected areas that

would not be expected to be obtained by playing, such as in softer areas of [his] thigh and belly." Although he expressed "the [minor's] injuries would be consistent with inflicted injury, . . . there [was] no way for him to differentiate whether the injuries were inflicted by the [aunt and uncle] or peers at school, as reported by the [aunt and uncle]."

The following day, SSA spoke with a psychologist and a social worker from the minor's school. Both provided similar details of past observations and circumstances at school. There were multiple occasions where the minor arrived at school with unexplained bruises that caused them concern. When asked about them, the minor sometimes would say he fell or ran into something. On at least one occasion, he told the school psychologist that "he has to 'clean a lot or he cannot go to sleep,'" and he asked they not tell his aunt because he "'almost made it to the end of the month.'" The psychologist did not inquire further. Being concerned about the situation, the school made reports to the child abuse hotline. Neither the social worker nor the psychologist was aware of any reported bullying of the minor or physical altercations between him and other students.

SSA spoke with mother to advise her it was adding allegations of general neglect and caretaker absence against her. Mother was upset and expressed disagreement with the allegations, saying she did not neglect her son by having him live with the aunt and uncle. When discussing the dependency process and reunification services, mother conveyed, "'[I]t's not that I don't want him in my care, you guys [(i.e. SSA)] need to stand by parents and offer us services.' . . . '[Y]es I want that, I want reunification services.'"

A day later, the day before the detention hearing, SSA tried contacting father but was unable to reach him because he was incarcerated in

an Orange County jail and the jail informed SSA he was in court. SSA also spoke with mother again. She conveyed a willingness to work with SSA for the best interests of the minor, acknowledging the situation was stressful and "she wants to 'get this over with.'" Expressing concern about the minor potentially harming her three daughters, mother suggested that maybe the minor's maternal grandmother could move into her home and supervise the minor. She also suggested the minor receive services through a particular behavioral program. When asked why she did not previously seek those services for him if she was aware of them, mother said she had just recently learned of them, she previously asked for services but was not provided any guidance, and it was tough being a mother of four children.

A social worker who worked on a 2022 San Bernardino County dependency case involving the minor and mother also spoke with SSA. Consistent with mother's statement, the social worker confirmed the prior case involved allegations that the minor made videos of himself "'playing with his butt and touching [his sister].'" The investigation was closed after mother voluntarily complied with a suggested safety plan which involved, inter alia, sending the minor to live with the aunt.

*B. 2015 juvenile dependency proceeding*

According to the detention report, the minor and his younger sister were declared dependents of the Orange County juvenile court as part of a 2015 dependency proceeding. The minor was almost four, and they were removed from mother's care based on allegations that the sister sustained multiple bruises and a lump on her head while in the care of the mother's then boyfriend. The sustained allegations also detailed a history of domestic violence between mother and the minor's father, which included father being arrested and the issuance of more than one restraining order. The

dependency terminated in early 2017, with mother and father having joint legal custody, mother being given primary physical custody, and father being given four hours of visitation one time per month.

*C. Past SSA inquiries into abuse against the minor*

The detention report indicated that between February 2024 and the May 2025, SSA was notified nine different times about potential abuse of the minor based on statements made by the minor and/or observations of bruises on his body. In response to the reports, SSA either documented matters for "information only" or conducted an investigation which concluded the physical abuse allegations were unfounded or, in one instance, inconclusive.

On multiple occasions, SSA spoke with the minor, as well as the aunt and uncle. The aunt and uncle consistently denied any physical abuse. One time they conveyed he was "always getting bruised, so it [was] not out of the ordinary for [him] to have a new bruise." More than once, despite having made statements about abuse which led to someone making a report, the minor denied any physical abuse or discipline when speaking to SSA. On those occasions, he said the bruises resulted either from a fall or something else he did which caused his body to hit something. One time, however, the minor confirmed to SSA that the uncle caused his nose to bleed by pinching it. SSA ultimately determined the allegations were inconclusive because the uncle, the aunt, and mother all denied any physical abuse.

*D. SSA recommendation*

Based on the overall circumstances, SSA recommended the minor remain detained at Orangewood pending a jurisdiction and disposition hearing. It further recommended four hours of weekly supervised visits for

mother and four hours a month of supervised visitation for father once he was released from custody.

II.

DEPENDENCY PETITION

The same day SSA filed the detention report, it filed a dependency petition. The petition alleged the minor fell within the juvenile court's jurisdiction for a variety of reasons. They included: the minor having suffered serious, nonaccidental physical harm caused "by the [minor's] parent or guardian"; a failure and/or inability of mother and father to protect the minor; the parents' willful or negligent failure to adequately protect the minor "from the conduct of the custodian with whom the [minor was] left"; the parents' willful or negligent failure to provide the minor with adequate food, clothing, shelter, or medical treatment; an inability of the father to provide the minor with regular care due to substance abuse; father's inability to provide for, or arrange appropriate care for, the minor due to father's incarceration; and the presence of a substantial risk the minor will be abused or neglected based on neglect or abuse of his sibling.

Among the factual allegations were the statements made by the minor to SSA about what the aunt and uncle had done to him, the aunt and uncle's admissions that they physically disciplined the minor the week before he was taken into protective custody, mother's belief the minor was lying about the abuse, and mother's desire for the minor to get better before she takes him back in her care. Additional allegations included the following: mother and father have a history of domestic violence, including acts in the minor's presence; father was found to have abused an unidentified minor in 2013; father may have an unresolved substance abuse problem; father has a criminal history; father has not been involved in the minor's life and is

11

incarcerated; and the minor and his younger sister were the subject of a dependency proceeding initiated in 2015 and terminated in 2017.

## III.

## DETENTION HEARING

At the detention hearing, mother denied all allegations in the petition and submitted on the issue of detention. While SSA requested the court provide her with four hours of weekly supervised visitation, mother requested eight hours weekly and the minor's counsel was in agreement with that amount. Since father had not been in the minor's life for 10 years, mother requested the court provide him with a maximum of two hours supervised visitation per month, which she said was consistent with the amount of visitation allowed to father under an existing court order entered in 2017. The court ordered the minor to be detained pending future hearings, with eight hours of weekly supervised visitation for mother and one hour of monthly supervised visitation for father. It also ordered no contact between the minor and the aunt and uncle.

## IV.

## JURISDICTION AND DISPOSITION REPORT

A jurisdiction and disposition report detailed SSA's interviews with mother and others, a visit with the minor, communications with the minor's school and Orangewood, and its attempts to contact father. Regarding the latter, SSA said it made a couple of attempts to contact father, but it was unsuccessful because he had been released from jail and his whereabouts were unknown.

The minor's school and Orangewood informed SSA that since the detention hearing, the minor was involved in a few separate altercations with students at school, involving at least three other students. On two occasions,

12

the minor yelled and used profanity toward other students, and on a different occasion, he threatened he would get a knife. At least one incident involved a student who was reported to have been bullying the minor "for an extended period of time." The school conveyed there were incidents in the past where the minor was picked on and he would respond by defending himself.

When SSA visited the minor, he was playing with other children and appeared easygoing and smiley. He did not want to talk about the alleged matters involving the aunt and uncle. In response to questions about the incidents at school, he explained there was a student in the same grade who had been bullying and bothering him. He expressed wanting to live with mother.

In the days after the detention hearing, mother expressed concern to SSA about the minor returning to her home. She said she wanted him to return to her care but, after consulting with her attorney, she felt "he should first receive the help he needs." "She emphasized that her priority is for the [minor] to receive the help he needs and to protect all of her children equally." When asked whether she believed the minor's statements about the aunt and uncle, she replied: "'I do have my doubts on both sides, and you guys are making me pick between my kid and my family member. I do have my doubts. I can't be up against the wall.'"

A few days later, SSA questioned mother about the petition's allegations. She expressed frustration about the abuse allegations, saying she did not think her sister (the aunt) would lie but she wanted to find out the truth, and suggesting lie detector tests for everyone. She relayed the minor "made similar allegations against [mother] in the past, which nearly resulted in her arrest." While she observed bruises on the minor, he never appeared fearful and the aunt "would attribute the injuries to accidents" in which the

13

minor hit or bumped himself on something. As for father, mother explained she had no contact with him, did not want to see him, and was fearful of him. She believed the various drug, crime history, and incarceration allegations concerning him. Overall, she "stated that having the [minor] under the protection of [SSA] is a positive step, as she believed he [would] receive the help he needs" instead of possibly "fall[ing] through the cracks."

During SSA's interviews with the aunt and the uncle, both continued to deny the allegations and the aunt shared the minor had made similar allegations in the past which were not true. At the same time, both once again admitted to hitting the minor the week before he was taken from them after he allegedly stole a significant amount of their rent money. In addition, the aunt said that when the minor "was out of control," she would give him "a light spank with her hand or with Crocs (soft shoes), which she believed were not harmful." The uncle said he spent little time with the minor because of his work schedule, but said the aunt had previously told him the minor was being bullied at school. The aunt also identified bullying as an issue, saying the minor told her about it and she brought it up with school staff at a meeting. They "assured her they were addressing it."

The minor's stepfather, with whom the minor lived before mother placed him in the care of the aunt and uncle, described his observations of the minor over time. Starting in about fourth or fifth grade, the minor started having trouble interacting appropriately with peers at school and in after school programs. After the minor started living with the aunt and uncle, he and mother would see the minor every other weekend for a couple of hours. He noticed bruises, but said the minor "would laugh about it, saying that he had fallen," and in other instances, he said they were from school or from slipping in the shower. The stepfather conveyed he never saw the minor show

14

fear or an abnormal reaction when responding to directions from the aunt, and he "showed no signs of distress" during video calls from the aunt and uncle's house. As for potential placement, the stepfather shared that their family is small and relatives are afraid to take responsibility for the minor because they fear he may hurt someone.

In making a recommendation, SSA indicated mother had not provided it with any information showing she was participating in recommended services. It further expressed its belief mother had made no progress toward alleviating or mitigating the matters which led to court involvement, and stated "[v]oluntary [c]hild [p]rotective [s]ervices [were] not an appropriate alternative to declaration of dependency." It summarized: "The Social Services Agency believes the family will benefit from ongoing Juvenile Court supervision in order to ensure the parents follow through with the recommended services, allowing the family to address any barriers that could hinder their ability to adequately provide for the [minor's] needs."

V.

TRIAL COURT'S JURISDICTION AND DISPOSITION ORDER

After hearing from counsel for mother, the minor, and SSA, the juvenile court found SSA met its burden of demonstrating the minor fell within the scope of the court's jurisdiction. It "sustain[ed] all of the allegations in the petition with the exception of (b)(4) [of section 300]," which concerned allegations of domestic violence between mother and father more than 10 years prior. Based on the sustained allegations, it found jurisdiction under section 300, subdivisions (a), (b)(1), (g), and (j). The court declared the minor a dependent, ordered him removed from his parents' custody and continued his existing placement, ordered reunification services for mother,

15

and found pursuant to section 361.5, subd. (b)(1) that reunification services did not need to be provided to father.

Mother timely appealed from the jurisdiction and disposition order.

## DISCUSSION

Mother challenges the juvenile court's jurisdictional findings, arguing there is insufficient evidence to support them. SSA argues mother forfeited her ability to challenge the jurisdictional findings by agreeing below to the minor's custodial removal.[2] Alternatively, it contends the court's jurisdictional findings are supported by substantial evidence. We find no forfeiture under the circumstances, find there is insufficient evidence to support some of the factual allegations sustained by the court, and conclude the court erred in making certain of the jurisdictional findings. However, because we find one jurisdictional basis is supported by substantial evidence, the court did not err in assuming jurisdiction over the minor.

### I.

### FORFEITURE

"[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.]" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, footnote omitted.) This forfeiture rule applies with equal force in dependency matters. (*Ibid.*)

---

[2] SSA uses the term "moot." However, it is clear from its analysis that it is challenging issue preservation, which is more properly characterized as an alleged forfeiture.

16

SSA argues mother forfeited her right to challenge the jurisdictional findings because she "necessarily agreed to jurisdiction" when she "outright agreed to an out-of-home disposition." We disagree.

Generally, a parent who "submits" on a disposition recommendation or expressly agrees with a proposed disposition forfeits their right to contest a court's dispositional order that adopts the recommendation. (See *Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 813; *In re Richard K.* (1994) 25 Cal.App.4th 580, 589 (*Richard K.*).) But, mother is not challenging the court's dispositional determination. Rather, she is challenging the jurisdictional findings it made before considering the appropriate disposition. Contrary to SSA's assertion, her acquiescence to SSA's proposed disposition is not an implicit concession of the appropriateness of the court's assumption of jurisdiction over the minor.

At the jurisdiction and disposition hearing, mother's counsel told the court mother did not agree with it finding true all of the allegations in the petition. Her counsel then elaborated as to a few of them. In addition, even when a parent does not contest the state of the evidence, their right to challenge it as insufficient to support a court's jurisdictional findings is preserved. (See *Richard K., supra*, 25 Cal.App.4th at p. 589; *In re Anthony G.* (2011) 194 Cal.App.4th 1060, 1064.) Accordingly, we find mother did not forfeit the arguments she raises on appeal.

## II.

### RELEVANT LAW, GENERALLY, AND STANDARD OF REVIEW

The opening clause of section 300 provides: "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court." The subdivisions that follow describe children who may be adjudged

dependents of the court. Among them are the four categories pursuant to which the petition's allegations in this case were made—subdivisions (a), (b), (g), and (j).

Subdivision (a) of section 300 concerns children who have suffered, or are at a substantial risk of suffering, serious physical harm caused nonaccidentally "by the child's parent or guardian." A critical component of the showing required under this subdivision is that the harm or risk of harm relates to actions of a parent or guardian.

Subdivision (b) of section 300 speaks to situations in which a "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness," due to specified circumstances. Those circumstances include, among others: (1) a parent's failure or inability to adequately supervise or protect the child; or (2) a parent's inability to provide regular care for the child due to the parent's mental illness. (I*d.*, subd. (b)(1)(A) & (D).)

Subdivision (g) of section 300 is implicated, among other circumstances, when a "child has been left without any provision for support . . . [or] the child's parent has been incarcerated or institutionalized and cannot arrange for the care of the child."

Subdivision (j) of section 300 concerns a child whose sibling has been abused or neglected and there is a substantial risk the child will, themselves, be abused or neglected.

In the juvenile court, SSA bears the burden of proving by a preponderance of the evidence that a child is a person described by section 300. (§ 355, subd. (a); *In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) "'[A] jurisdictional finding good against one parent is good against both. More accurately, the minor is a dependent if the actions of either parent bring [the

18

minor] within one of the statutory definitions of a dependent.'" (*In re Briana V.* (2015) 236 Cal.App.4th 297, 308.)

On appeal, we review the juvenile court's jurisdictional findings for substantial evidence. (*I.J., supra*, 56 Cal.4th at p. 773.) That is, we look to whether there is contradicted or uncontradicted evidence that is reasonable, credible, and of solid value supporting the court's findings. (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.) "'"In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the [juvenile] court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the [juvenile] court." [Citation.] "We do not reweigh the evidence or exercise independent judgment."'" (*I.J.,* at p. 773.)

Although one valid jurisdictional finding is enough to declare a child a dependent (*In re D.P.* (2023) 14 Cal.5th 266, 283 (*D.P.*)), we may exercise our discretion to review all challenged findings if, for example, the findings "'could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings,' . . . '"could have other consequences for [the appellant], beyond jurisdiction,"'" or are "based on particularly pernicious or stigmatizing conduct" (*id.* at pp. 285–286).

### III.

### ANALYSIS

*A. Allegation a-1*

Allegation a-1 of the petition alleged the minor "has been physically abused by" the aunt and uncle. Notwithstanding the aunt and uncle's persistent denials of abuse, there is substantial evidence to support the juvenile court's true finding on this allegation. Nearly everyone with whom SSA spoke said they noticed bruises on the minor during the time he

19

was living with the aunt and uncle. Although the minor had previously denied the aunt and uncle as being the cause of the bruising on multiple occasions, he later conveyed they were the cause. On the day he was taken into protective custody by law enforcement, he said they would physically discipline him with the metal part of a belt, a metal pole, their hands, or a cell phone. The juvenile court, which is charged with making credibility findings (*I.J., supra*, 56 Cal.4th at p. 773), believed him.

Even though there is substantial evidence to support factual allegation a-1, it cannot justify the juvenile court's finding of dependency jurisdiction under subdivision (a) of section 300. Subdivision (a) relates to serious physical harm or risk of such harm caused by a "parent or guardian." The statute expressly states "guardian" means a child's legal guardian. (§ 300.) As SSA admits, neither the aunt nor the uncle was the minor's legal guardian. Because this factual allegation was the sole basis offered by SSA for a jurisdictional finding under subdivision (a) of the statute, the trial court erred in finding jurisdiction pursuant to that subdivision.

*B. Allegation b-1*

Allegation b-1 of the petition was factually identical to allegation a-1, but it was included as supporting jurisdiction under subdivision (b)(1) of section 300. Like the juvenile court's true finding on the latter, the juvenile court's true finding on the former is supported by substantial evidence. But, for the same reason allegation a-1 was insufficient to justify dependency jurisdiction, allegation b-1 is not a viable ground, alone, to justify jurisdiction. Subdivision (b)(1) concerns serious physical harm or substantial risk thereof caused by a specified failure or inability of a parent or guardian to do certain things (e.g., supervise or protect them, provide them with adequate food or shelter). By its plain language, the actions of someone other than a parent or

20

guardian cannot, alone, support such a jurisdictional finding. Though allegation b-1 cannot be a sole basis for jurisdiction, we agree with SSA it may be considered in conjunction with other sufficiently supported allegations to determine whether the juvenile court's jurisdictional finding under subdivision (b)(1) was proper.

*C. Allegation b-2*

Allegation b-2 of the petition alleged mother failed to protect minor by allowing him to live with the aunt and uncle after he disclosed physical abuse at their hands. It further alleged the minor is at a substantial risk of future harm because mother had observed marks and bruises on him, but she continued to believe he was lying about what took place at the aunt and uncle's house.

There is no evidence in the record demonstrating mother was actually aware of what allegedly took place at the aunt and uncle's house before the minor was taken into protective custody. This includes a lack of evidence that the minor had previously told mother about the physical abuse. The juvenile court's findings in those respects are not supported by substantial evidence.

Nevertheless, there is substantial evidence to support the court's jurisdictional finding based on mother's failure to adequately supervise or protect the minor. One of the circumstances in which subdivision (b)(1) of section 300 applies is when a child has suffered serious physical harm due to a parent's negligent failure to adequately supervise or protect them "from the conduct of the custodian with whom the child has been left." (§ 300, subd. (b)(1)(B).)

Mother said she saw the minor at least three to four times a month during the more than two years he lived with the aunt and uncle. In

21

addition, she admitted she observed marks and bruises on him during that time, and she believed the aunt and uncle would discipline the minor by hitting him on the buttocks with a sandal or hand. However, mother's only inquiry into the bruises and marks were questions to the minor and the aunt. She did nothing further when they both denied matters. Given the known use of physical discipline and the persistent presence of bruises and marks, there is sufficient evidence to support a finding that mother was negligent in failing to adequately protect the minor from the aunt and uncle's conduct. And because there was evidence mother continued to disbelieve the minor's statements even after he was taken into protective custody and evaluated by medical professionals, as well as evidence that mother did not believe physical abuse allegations of another of her children in a prior dependency proceeding, there is substantial evidence demonstrating a future risk of mother not adequately responding to any abuse concerns which may arise.

*D. Allegation b-3*

Allegation b-3 of the petition alleged the minor "has been left without a legal caregiver able to provide for [his] support and supervision." Mother argues on appeal that it was unnecessary for the juvenile court to assert jurisdiction over the minor because she wants the minor to receive services and is willing, for example, to send him to a "'residential leadership academy for teens'" so he can receive the care he needs. (Italics omitted.) The question before us, however, is not whether the assumption of jurisdiction was necessary, but whether it is supported by substantial evidence. We find it is.

More than once, mother told SSA she was not willing to have the minor in her home until he received services because she was concerned he posed a danger to her other children. She suggested another potential

22

relative placement, and SSA contacted that individual and other family members, but no one said they would take in the minor. Further, mother did not suggest any residential program or show she had the means for placing him in such a program or that he would otherwise be accepted. With father uninvolved in the minor's life, mother unable to have him live with her, and no other identified placement, substantial evidence supports the court's assertion of jurisdiction under subdivision (b)(1) of section 300.

*E. Allegations b-5, b-6, b-7, and b-8*

Allegations b-5 through b-8 exclusively concerned father. They alleged he abused a child in 2013, "may have unresolved substance abuse problems," "has a criminal history" involving arrests and/or convictions for a variety of crimes, and was incarcerated at the time the petition was filed. Irrespective of whether these allegations were supported by substantial evidence, a matter on which we express no opinion, they do not provide a basis for jurisdiction under the circumstances.

Subdivision (b)(1) of section 300, like other subdivisions of the same statute, requires harm or a substantial risk of harm to a child based on the alleged parental behavior or failure. Everyone SSA spoke to about father, including mother and the minor, said father had not seen the minor in 10 years, and mother expressed wanting nothing to do with father. In addition, there was no evidence father was in contact with, or had attempted to make contact with, mother, the minor, or anyone with whom SSA spoke. Under these circumstances, father's alleged behavior, even if true, cannot have harmed or posed a substantial risk of harm to the minor.

*F. Allegation b-9*

Allegation b-9 of the petition concerned the 2015 dependency proceeding involving the minor and his younger sister. It set forth sustained

23

allegations from that proceeding which concerned three types of circumstances: 1) injuries the minor's sister sustained while in the care of mother's then boyfriend and a maternal aunt (not the aunt involved in the present proceedings); 2) domestic violence between mother and father which took place between 2011 and 2015, some of which took place in front of the minor and his sister; and 3) father's criminal history and 2013 perpetration of child abuse.

SSA admits "[t]he facts underlying the prior dependency[,] alone[,] were not sufficient for jurisdiction." The abuse in that situation involved a different child and different perpetrators, and the matter terminated more than eight years before this one began. We agree with SSA, however, the juvenile court could consider some of the sustained allegations in making a risk determination in this case because of some of the similarities. (See *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1650 [pattern of behavior evidenced by various allegations, including past conduct, may aid in forming basis for dependency jurisdiction].) Like the situation which led to this dependency proceeding, the prior proceeding involved abuse of one of mother's children at the hands of one or more caregivers and mother did not believe the caregivers harmed the minor despite numerous bruises and "professional evidence."

G. *Allegation g-1*

Allegation g-1 alleged father was in jail when the petition was filed, he had no contact with the minor, and he was unable to provide or arrange appropriate care for the minor. Based on the sustaining of this allegation, the juvenile court found jurisdiction under section 300, subdivision (g), which applies, in relevant part, when a "child's parent has

24

been incarcerated or institutionalized and cannot arrange for the care of the child."

From a factual standpoint, the juvenile court erred in sustaining allegation g-1 because SSA's report stated father was released a few days after the filing of the petition. In other words, he was not incarcerated at the time of the jurisdictional hearing. (*In re M.R.* (2017) 7 Cal.App.5th 886, 897 [subdivision (g) of section 300 applies when, inter alia, parent is incarcerated at time of jurisdictional hearing].) And, from a legal standpoint, father did not have physical custody of the minor; he was only permitted a one-time, four-hour visit per month. Nothing indicates the Legislature intended to allow the juvenile court to exercise jurisdiction over a child under subdivision (g) based on the former incarcerated status of a noncustodial parent who has not been involved in the child's life for a decade.

*H. Allegation j-1*

Allegation j-1 of the petition was factually identical to allegation b-9, involving the 2015 dependency case which stemmed from alleged abuse against the minor's younger sister. The juvenile court's reliance on the 2015 dependency to establish jurisdiction under section 300, subdivision (j) was error. Subdivision (j) concerns a substantial risk of harm to a child based on the fact the child's sibling has been abused. (See *In re Carlos T.* (2009) 174 Cal.App.4th 795, 803.) The 2015 dependency does not establish such a risk to the minor. The abuse on which that dependency proceeding was based took place roughly eight years before any of the alleged abuse in this case, it was done by different individuals, and there is no evidence those individuals are involved in the minor's life. As a result, there simply is insufficient evidence to demonstrate a sufficient current risk to the minor based on such remote prior abuse of his sibling.

25

## I. Conclusion

Without sufficient evidentiary support for a finding of jurisdiction under subdivisions (a), (g), or (j) of section 300, the juvenile court erred in exercising jurisdiction over the minor pursuant thereto. However, because only one valid basis is necessary to establish jurisdiction, the sufficiently supported finding based on subdivision (b)(1) of the statute is enough to uphold the court's exercise of jurisdiction. (See *D.P., supra*, 14 Cal.5th at p. 283.) We remand the matter for entry of a new order to clarify the record for current and future purposes.

## DISPOSITION

The challenged order is affirmed in part and reversed in part. On remand, the juvenile court shall issue an order: (1) striking allegation g-1; (2) vacating its jurisdictional findings under section 300, subdivisions (a), (g), and (j); and (3) vacating its jurisdictional finding under subdivision (b)(1) only to the extent it was based on allegations b-1, b-5, b-6, b-7, b-8, and b-9.


DELANEY, J.

WE CONCUR:


SANCHEZ, ACTING P. J.


GOODING, J.